# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 04 C 50397 | **DATE** | 8/30/2005 |
| **CASE TITLE** | Butinski vs. Barnhart | | |

**DOCKET ENTRY TEXT:**

For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is affirmed. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied. Defendant's Motion for Judgment is granted.

*[signature]*

Notices mailed by judge's staff.

■ [ For further detail see attached order.]

# FILED

## AUG 3 0 2005

**MICHAEL W. DOBBINS, CLERK
UNITED STATES DISTRICT COURT**

| | Courtroom Deputy Initials: | AM |
|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| LINDA F. BUTINSKI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 50397 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Linda Butinski ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§

405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for

Supplemental Security Income ("SSI") pursuant to Title II of the Social Security Act, 42 U.S.C.

§ 216(I), 223. This matter is before the Magistrate Judge pursuant to consents filed by both

parties on July 1, 2005. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.     BACKGROUND

Plaintiff filed for SSI on December 20, 2002 (Tr. 79A), and her application for benefits

was denied on January 6, 2003. (Tr. 74). Plaintiff filed a request for reconsideration on March

28, 2003 (Tr. 32), but the Administration affirmed the previous decision denying Plaintiff

benefits on June 11, 2003. (Tr. 34). Plaintiff filed a request for a hearing before an

Administrative Law Judge ("ALJ") on June 23, 2003. (Tr. 38). Plaintiff was granted a hearing

before ALJ Edward B. Pappert on September 16, 2003. (Tr. 57). Plaintiff appeared, with

counsel, before the ALJ on October 10, 2003. (Tr. 265). In a decision dated June 28, 2004, the ALJ found that Plaintiff was not entitled to SSI. (Tr. 16-24). The Appeals Council denied Plaintiff's request for review on August 27, 2004, making this case ripe for review. (Tr. 6).

## II.  FACTS

Plaintiff was born on July 28, 1963 (Tr. 169), making her approximately forty years of age at the time of her October 10, 2003, hearing before the ALJ. (Tr. 265). Plaintiff completed high school and some college credits. (Tr. 261). At the time of her hearing, Plaintiff lived at home with her husband and her daughters, ages ten and sixteen months. (Tr. 274). Plaintiff claims disability since May 12, 2000, due to asthma, epilepsy, diabetes, muscular disorder, a chronic left parietal infarct, depression, dissociative disorder, and post-traumatic disorder. (Tr. 106A).

From June, 1989 to February, 1991 (Tr. 107), Plaintiff worked as a chemical dependency technician at a treatment center. (Tr. 285). Plaintiff worked eight hours per day and five days per week. (*Id.*). No details regarding this job are contained in the record.

From 1991 to 1992, Plaintiff worked in maintenance and as an assistant manager of a club. (Tr. 284-85). At that job, she was paid at the rate of six dollars and fifty cents per hour. (Tr. 137). Plaintiff worked eight hours per day. (*Id.*). Plaintiff cleaned, cooked, ordered food, set up the kitchen, and managed inventory for special events. (Id.). Plaintiff spent eight hours either walking or standing at work. (*Id.*). Plaintiff frequently lifted fifty pounds of food during her working hours. (*Id.*). Plaintiff also did some writing and completed some reports. (*Id.*).

In 1993, Plaintiff was a waitress for one to two weeks. (Tr. 131). The court does not have any detail regarding this job on file.

In 1994, Plaintiff worked as a teacher's aide for a school. (Tr. 131). When Plaintiff was a teacher's aide, she was paid at the rate of five dollars per hour. (Tr. 136). Plaintiff worked seven hours per day and five days per week. (*Id.*). Plaintiff helped to set up activities for handicapped children. (*Id.*). Plaintiff also fed the children and used computers. (*Id.*). Plaintiff frequently lifted children that weighed up to 150 pounds. (*Id.*).

From September, 1995 to December, 1995, Plaintiff was a marketing director for a carpet cleaning company. (Tr. 131). As a marketing director, Plaintiff was paid at the rate of five dollars and fifteen cents per hour. (Tr. 135). Plaintiff worked eight hours per day and five days per week. (*Id.*). Plaintiff spent half of her work day training sales staff and the other half doing paper work. (*Id.*). Plaintiff walked or stood while she trained. (*Id.*). She sat while completing paper work. (*Id.*). Plaintiff used machines, tools, or equipment to do her job. (*Id.*). Plaintiff frequently lifted objects weighing twenty-five to thirty pounds. (*Id.*).

From 1996 to 1997, Plaintiff worked in food service. (Tr. 131). Plaintiff was paid at the rate of five dollars and fifteen cents per hour. (Tr. 134). Plaintiff worked six hours per day and five days per week. (*Id.*). Plaintiff walked or stood for six to eight hours per day. (*Id.*). Plaintiff spent half of her work day supervising three people. (*Id.*). At work, Plaintiff used machines, tools or equipment to make food for catering. (*Id.*). Plaintiff also did some writing and completed some reports at work. (*Id.*). Plaintiff frequently lifted objects weighing fifty pounds or more. (*Id.*).

From 1998 to 2000, Plaintiff worked in customer service for two different companies. (Tr. 131). Plaintiff was paid at a rate of seven to eight dollars per hour. (Tr. 133). Plaintiff worked eight hours per day and five days per week. (*Id.*). At work, Plaintiff used a computer to enter data and communicated with other people on the phone. (*Id.*). Plaintiff frequently lifted

objects weighing less than ten pounds, and she did not lift anything heavier than ten pounds. (*Id.*).

In May or April of 2001, Plaintiff worked as a cook/waitress. (Tr. 275). Plaintiff was paid at the rate of two dollars and nineteen cents per hour. (Tr. 132). Plaintiff worked six to eight hours per day and four to five days per week. (*Id.*). Plaintiff spent about six to eight hours walking at work. (*Id.*). Plaintiff frequently lifted thirty pounds of food during her working hours. (*Id.*). Plaintiff also did some writing and completed some reports while she was a waitress. (*Id.*).

In May or April of 2001, Plaintiff stopped working. (Tr. 275). Plaintiff stated that she left her last job because of stress and politics at the place she was working. (Tr. 276). Plaintiff stated that the reason she did not get another job was that she "got depressed and just gave up." (*Id.*). Since leaving work, Plaintiff's typical day is spent at home. (Tr. 278-79). At her hearing, Plaintiff indicated that she was able to feed her daughter, clean the house, wash dishes, and do the laundry, but she noted she could not shop on her own. (*Id.*).

At Plaintiff's hearing, she testified that she had been diabetic for five or seven years. (Tr. 280). Plaintiff stated that she was taking glucophage instead of insulin. (*Id.*). Plaintiff checks her sugars three times a day. (Tr. 294).

Plaintiff also testified about her back and body pain. She stated that she could not use her right hand to hold anything for a very long period of time due to back pain. (Tr. 288-289). Plaintiff also stated that her pain woke her up four or five times during the night. (Tr. 292). Plaintiff did not know the origin of her pain. (Tr. 295).

Plaintiff stated that she was diagnosed with a seizure disorder at an early age. (Tr. 280).

4

Plaintiff stated that her disorder was caused by injuries that occurred when she was a month old. (*Id.*). Plaintiff further testified that she experienced daily seizures, usually lasting a few seconds. (*Id.*). According to Plaintiff, seizures occurred if she was highly stressed or if she had just eaten after a long period of having not eaten. (Tr. 281).

The ALJ also heard questioning about Plaintiff's depression at her hearing. (Tr. 294). Plaintiff stated she had crying spells three to four times a week for fifteen minutes, up to an hour. (*Id.*). Plaintiff said some days she cannot get out of bed or function physically or mentally, causing her to get depressed and angry. (Tr. 296).

Plaintiff claimed that her legs bothered her the most of all her health problems. (Tr. 279). Plaintiff stated that she had problems with her legs since she was a child. (*Id.*). Sometimes, she could not get out of bed because her legs would not move. (Tr. 278). Plaintiff further indicated that she exercised and used weights on her legs to improve muscle strength. (Tr. 280).

At the time of her hearing, Plaintiff testified that she had not used any illegal drugs or alcohol for a year. (Tr. 286).

Vocational Expert ("VE"), Mr. Christopher Yep, testifying before the ALJ, stated that Plaintiff's past work as a customer service representative was semiskilled, sedentary work, and Plaintiff's past work in food service was classified as unskilled, light work. (Tr. 297). Plaintiff's past work as a chemical dependency technician was semi-skilled, light work. (*Id.*). The ALJ then asked the VE whether a hypothetical claimant, with the following characteristics could perform any of the past work identified for Plaintiff:

> a hypothetical Claimant 40 years of age with education and the past relevant work experience equivalent to the Claimant, unable to lift and carry more than 25 pounds frequently and 50 pounds occasionally. . . . Unable to work in areas of dangerous machinery, or at unprotected heights, or in situations, where having a brief

> jerking-like seizure or a brief staring spell would be dangerous to the Claimant or anyone else. Further unable to understand, remember, and carry out detailed instructions, be moderately limited in the abilities to deal with the general public, accept instructions and criticism from supervisors, and change – or – and respond appropriately to changes in the work setting.

(Tr. 298-99).

The VE testified that such a hypothetical claimant could not work at jobs that were identified as Plaintiff's past work. (Tr. 298). However, the VE stated that such a hypothetical claimant could work in packaging (44,743 jobs in the state of Illinois), in sorting (24,457 jobs in the state of Illinois), and in assembly (65,494 jobs in the state of Illinois). (Tr. 299-300).

The ALJ further limited his hypothetical, restricting lifting and carrying to no more than twenty pounds and no more than ten pounds. (Tr. 300). The VE stated that the hypothetical claimant could still do the work cited. (*Id.*). However, if there was restriction on Plaintiff's postural movements to only "occasionally," the VE testified that he would eliminate the packaging jobs. (Tr. 299-300).

After Plaintiff's hearing, a proffer dated October 22, 2003 was sent to Plaintiff's attorney by the ALJ. (Tr. 164). In that proffer letter, the ALJ indicated that he intended to enter medical reports of Dr. Hoffman dated February 25, 2003 into the record. (*Id.*). The proffer letter informed Plaintiff that she could submit written comments on the reports, a statement of the facts and law that she believed should be applied to the case in light of the report, submit interrogatories to Dr. Hoffman, request a supplemental hearing, and request that Dr. Hoffman be subpoenaed to appear at the supplemental hearing. (*Id.*). The proffer letter also stated that absent a response, the ALJ would assume that Plaintiff did not wish to submit a written statement or other evidence, or request a supplemental hearing, and the ALJ would "enter the

6

enclosed evidence in the record and issue [his] decision." (Tr. 165). Plaintiff's attorney, Mr. McCarty, responded to the proffer letter on October 23, 2003. (Tr. 77). In the response, Plaintiff argued that because she was diagnosed with borderline personality disorder, she was disabled under Listing 12.08(A)(4), 12.08(A)(6), 12.08(B)(2), and 12.08(B)(3). (*Id.*).

## III.   **MEDICAL HISTORY**

Plaintiff's earliest medical records before this court are the progress notes covering May 2, 2000, to May 2, 2003, from Crusader Central clinic.[1] (Tr. 189-203, 243-250). The notes indicate that Plaintiff underwent treatment for asthma, sinusitis, gastritis, GERD, non-insulin dependent diabetes mellitus, obesity, seizures, and depression. (*Id.*). On August 6, 2001, Plaintiff requested a letter stating she could not be outside in the heat due to her asthma. (Tr. 189). On August 31, 2001, Dr. Yontz completed a progress report for Plaintiff. (Tr. 190). In the report, Dr. Yontz noted that Plaintiff was taking Celexa, Glucophage, Albuterol, Flovent for asthma, and Neurontin for seizures. (*Id.*). Plaintiff indicated her only complaint was that her feet hurt. (Tr. 190). Plaintiff had numerous blisters from walking continuously. (*Id.*). Dr. Yontz noted her impression of diabetes mellitus, asthma, and depression. (*Id.*). A different doctor completed a progress report dated October 10, 2001. (Tr. 191). A Dr. Wright indicated Plaintiff had a medical history of asthma, diabetes, seizures, and depression. (*Id.*). Dr. Wright also noted that Plaintiff had had difficulty with pain due to coughing for two to three days. (*Id.*). The assessment given by Dr. Wright was URI, sinusitis, diabetes, and asthma. (*Id.*). Dr. Wright encouraged Plaintiff to take her medications. (*Id.*). On December 6, 2002, Plaintiff requested a referral to a dietician for her diabetes. (Tr. 198). On July 30, 2003, Plaintiff requested a letter to

---

[1]Listing the details in each clinic progressive note is unnecessary, but the court will summarize relevant progress notes. (Tr. 189-203).

be off work for one year, but Dr. Hameeduddin indicated he would be "unable to do that for her." (Tr. 250).

Plaintiff underwent the first of two consultative psychiatric examinations with Dr. Hoffman on August 29, 2001. (Tr. 260-61). Dr. Hoffman noted that Plaintiff's mood was "testy" and that Plaintiff admitted to being "angry," but otherwise did "not appear physically or mentally ill." (Tr. 260). Plaintiff informed Dr. Hoffman that a psychologist had told her a number of years before that she had clinical depression. (*Id.*). Plaintiff also told the doctor that she started to drink alcohol and use drugs at the age of eight, and revealed that she was sexually molested from the age of two by members of her family. (*Id.*). Plaintiff told the doctor that she had a lot of anger inside, did not want to do anything, and that she slept excessively. (*Id.*). Plaintiff also stated that her relationship with others could be described as "trauma to drama" most of the time. (*Id.*). Plaintiff indicated that scars on her arms came from scratching herself when she was angry. (*Id.*). Dr. Hoffman's report observed that Plainitff had been taking forty milligrams of Celexa[2] a day. (*Id.*). Before taking Celexa, Plaintiff indicated that she had been using Prozac for three years and Zoloft for six months. (*Id.*). According to Plaintiff, Celexa kept her from dipping too low and modulated her anger. (*Id.*). At her exam, Plaintiff's concentration, judgment, and abstract thinking were "ok." (Tr. 261). Plaintiff has reasonable registration and recall of both short and long term memory. (*Id.*). Dr. Hoffman diagnosed Plaintiff with exogenous obesity and a borderline personality disorder, which "explain[ed] most, if not all, of her symptoms." (Tr. 261).

_____

[2] Celexa is an antidepressant. *See* PHYSICIANS' DESK REFERENCE 1344 (57th ed. 2003).

8

On August 26, 2002, Plaintiff was taken to Swedish American Hospital by ambulance. (Tr. 166, 167). Scene medics reported that Plaintiff was lethargic and diaphuretic, and gave Plaintiff a coca cola due to low blood sugar. *(Id.)*. Plaintiff's original gluco reading was 119, which was reassessed at 146. *(Id.)*. At the emergency room, Plaintiff stated she felt fine. (Tr. 169). She thought her episode was caused by not eating. *(Id.)*. Plaintiff's diabetes was reported as controlled by diet only. *(Id.)*. Her diagnosis was a hypoglycemic episode. (Tr. 170).

Plaintiff reported falling on her bed and hurting the right side of her chest on December 12, 2002. (Tr. 198). A PCI Radiology report dated the same day indicated that Plaintiff's right ribs were normal. (Tr. 204).

On December 28, 2002, Plaintiff had a emergency visit at the Swedish American Hospital due to a cough she had for two weeks. (Tr. 182). Plaintiff denied any other problems. *(Id.)*. The report indicated that Plaintiff was prescribed Erythromycin for acute bronchitis and discharged in stable condition in no acute distress. (Tr. 183).

On February 24, 2003, Plaintiff's daughter, Kaye Lynn, filled out a seizure description form. (Tr. 143). In the form, Plaintiff's daughter noted that she witnessed two seizures that occurred at night. (Id.). She also indicated that, during the seizures, Plaintiff had jerking, thrashing movements; Plaintiff did not lose consciousness; Plaintiff did not bite her tongue; Plaintiff did not lose bladder or bowel control; Plaintiff did not injure herself. *(Id.)*. Plaintiff's daughter further indicated that Plaintiff received warning of the seizures, and, after the seizures, Plaintiff seemed tired and found it "hard to formulate sentence." *(Id.)*.

On February 24, 2003, Plaintiff's husband, Thomas Taylor, filled out a seizure description form. (Tr. 144). Mr. Taylor indicated that he witnessed fifty seizures between November 23, 2002, and February 25, 2003. *(Id.)*. Mr. Taylor also indicated that, during the

9

seizures, Plaintiff had jerking, thrashing movements; Plaintiff did not lose consciousness; Plaintiff did not bite her tongue; Plaintiff did not lose bladder or bowel control; Plaintiff did not injure herself. (*Id.*). Mr. Taylor further indicated that Plaintiff received warning of the seizures, and, after the seizures, Plaintiff seemed "very tired, confused, disoriented." (*Id.*).

On February 25, 2003, Plaintiff went back to see Dr. Hoffman. (Tr. 262-63). Dr. Hoffman indicated that Plaintiff was able to "think, reason, and respond in a logical, coherent, and prompt manner." (*Id.*). Dr. Hoffman noted that Plaintiff did not appear mentally ill. (*Id.*). Plaintiff informed the doctor that she was using cocaine until October, 2002, but claimed that she had had no alcohol or cocaine since then. (*Id.*). Plaintiff also told the doctor that she was depressed and had negative thoughts about herself. (*Id.*). Plaintiff said she had an overeating problem. (*Id.*). Regarding her unemployment, Plaintiff said she "might look for work but can't get my stuff together." (*Id.*). Plaintiff also thought her "short fuse" and tumultuous relationships prevented her from keeping a job. (*Id.*). Dr. Hoffman noted that he did not think Plaintiff was suicidal. (*Id.*). Plaintiff told the doctor that she had been to counseling for years for Dissociative Disorder[3] and Post-traumatic Stress Disorder (PTSD).[4] (*Id.*). Regarding her physical symptoms, Plaintiff stated that she woke up at night sweating twice a week. (*Id.*). Plaintiff also informed the doctor that she had epilepsy, which she described as "body jerking with a warning of electrical worms crawling inside her head." (*Id.*). Plaintiff explained that this occurred two or three times a day, when she goes home to relax. (*Id.*). Although she thought she was conscious during her seizures, Plaintiff said she would suddenly feel tired and could not understand what

---

[3]Plaintiff described her symptoms by noting she "leaves her body when she wants to." (Tr. 262).

[4]Plaintiff described her symptoms as "anxiety attacks," and she said that she could not sleep at night." (Tr. 262).

other people were saying. (*Id.*). At her exam, Plaintiff's concentration, judgment, memory and abstract thinking were "ok." (*Id.*). Dr. Hoffman's diagnostic impression indicated cocaine dependence with four months abstinence, alleged PTSD not meeting full criteria at Axis I and borderline personality disorder at Axis II. (Tr. 263). At Axis III, Dr. Hoffman stated Plaintiff:

> claims Asthma without evidence of same in this office. Her diabetes is most likely of the type 2 variety due to morbid obesity. There was no evidence of Dissociation in this office. There was no seizure in this office. Her 'seizure' history is, if it exists, very atypical. It will be interesting to see what her current EEG and C-Scan shows. This may be a conversion like symptom and pseudo neurological because Plaintiff did not display the appropriate affect[5] of concern.

(*Id.*).

A PCI radiology report dated February 25, 2003, indicated a finding of a peripheral area of low attenuation in the posteromedial parasagittal left parietal lobe. (Tr. 188). The report indicated that this finding was "most suggestive of a chronic left parietal infarct." (*Id.*). The report further stated that this finding was "distinctly unusual in a patient of [Plaintiff's] age." (*Id.*). Dr. Steffen recommended further evaluation and carotid ultrasound examination. (*Id.*).

An EEG report dated February 25, 2003, noted that Plaintiff had a normal awake and drowsy state EEG. (Tr. 206). The report did not indicate any abnormal neurophysiological activities. (*Id.*).

On March 12, 2003, Dr. MacLean, a state agency physician, completed a Psychiatric Review Technique Form for Plaintiff. (Tr. 221-34). Under Listing 12.08/12.09, Dr. MacLean determined that Plaintiff was mildly limited in daily living activities, moderately limited in maintaining social functioning, and moderately limited in maintaining concentration,

---

[5]The emotional feeling, tone, and mood attached to a thought, including its external manifestations. STEDMAN'S MEDICAL DICTIONARY 33 (26th ed. 1995).

persistence, or pace. (Tr. 231). Dr. MacLean believed that Plaintiff exhibited no episodes of decompensation. (*Id.*). Dr. MacLean noted that Plaintiff had a cocaine dependant borderline personality disorder without marked limitations. (Tr. 233).

Dr. Donald MacLean also completed a Mental Residual Functional Capacity Assessment Form ("MRFC") for Plaintiff on March 12, 2003. (Tr. 217-19). Dr. MacLean reported that Plaintiff was moderately limited in her ability to understand and remember detailed instructions and had moderate limitations in carrying out detailed instructions, but noted that Plaintiff was able to "understand, remember, and carry out simple tasks." (Tr. 217, 219). Dr. MacLean noted that Plaintiff was moderately limited in her ability to interact appropriately with the general public. (Tr. 218). Dr. MacLean also noted that Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors was moderately limited. (*Id.*) Dr. MacLean believed that Plaintiff's ability to respond appropriately to changes in the work setting was moderately limited. (*Id.*) Dr. MacLean stated that Plaintiff was able to make simple work related decisions, get along with others, and cope with changes in single work situations. (*Id.*). However, Dr. MacLean believed that Plaintiff was not able to "sustain public interaction." (*Id.*).

The physical Residual Functional Capacity Assessment Form ("RFC"), dated March 17, 2003, completed by Dr. Arjmand reported that Plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand or walk for a total of about six hours in an eight-hour workday, and sit with normal breaks for a total of about six hours in an eight-hour workday. (Tr. 236). Dr. Arjmand indicated that Plaintiff had no postural, manipulative, visual, or communicative limitations. (Tr. 237-39). Dr. Arjmand noted that Plaintiff needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 239). Also, Dr.

Arjmand noted that Plaintiff needed to avoid hazards such as machinery, heights, etc. (*Id.*). Finally, Dr. Armjand observed that Plaintiff's seizures did not occur frequently enough to cause significant limitations. (Tr. 242).

On April 10, 2003, Plaintiff had a criteria ultrasound examination and MRI. (Tr. 211-12). The PCI report completed by Dr. Bonelli indicated that no flow-limiting stenosis was identified. (*Id.*). The report noted that mild atheromatous disease was seen involving both bifurcations. (*Id.*). Plaintiff's MRI indicated an old area of encephalomalacia over Plaintiff's left parietal region. (*Id.*). There was no evidence of an ischemic event, but Dr. Bernsten recommended Plaintiff be evaluated further for vasculitis and potentially lupus. (Tr. 212).

## IV.   STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however, is not *de novo*; the court "may not decide the facts anew, re-weigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

14

laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[6] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[7] A severe impairment is one which significantly limits the claimant's physical or

---

[6]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. *See* 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[7]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will

mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security

use the singular "impairment" to include both singular and multiple impairments.

Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI. ANALYSIS

The court will proceed through the five step analysis in order.

### A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since she alleged disability. (Tr. 17). The finding of the ALJ as to Step One of the analysis is not challenged by either party, and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the analysis is affirmed.

### B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two analysis, the ALJ found Plaintiff suffered from severe

impairments based on the requirements in 20 C.F.R. §404.1520(b). (Tr. 17). This finding is not challenged by either party, and the court finds no reason to disturb it. Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. The ALJ's finding as to Step Two of the analysis is affirmed.

## C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in the Listing of Impairments, 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 28, 24). First, the ALJ found that Plaintiff's asthma did not meet the requirements of Listing 3.03 and 3.02 because her asthma had not resulted in attacks, and there was no record to reflect any pulmonary function studies with results equivalent to that required under the tables associated with Listing 3.02. (Tr. 17). Second, the ALJ found that Plaintiff's diabetes did not meet Listing 9.08 because her condition had not resulted in either neuropathy that had resulted in sustained disturbance of gross and dexterous movements in two extremities; or acidosis occurring at least once every two months; or retinitis proliferans. (*Id.*). Third, the ALJ determined that Plaintiff's convulsive epilepsy did not meet the requirements of Listing 11.02 because it did not occur frequently enough. (*Id.*). Fourth, the ALJ found that Plaintiff's arthritis did not meet the requirement of Listing 1.02(A) or 1.02(B) because Plaintiff could ambulate effectively and there was no evidence of gross anatomical deformity with involvement of one major peripheral weight-bearing joint in each upper extremity that results in an inability to perform fine and gross movements effectively. (Tr. 18). Fifth, the ALJ determined that Plaintiff did not meet the requirement under Listing 12.08

18

and/or 12.09, because Plaintiff only exhibited a mild limitation in activities of daily living, a moderate limitation in social functioning and maintaining concentration, persistence and pace, and no episodes of decompensation. (*Id.*).

Plaintiff challenges the ALJ's Step Three analysis. Specifically, Plaintiff limits her entire appeal to contesting the ALJ's finding under Listing 12.08. First, Plaintiff claims that at the time of her hearing, she had stopped drug use for about a year, so the ALJ should have focused on Listing 12.08 instead of 12.09. Second, Plaintiff argues that the ALJ should have held a supplemental hearing to call a medical expert regarding her mental disorders.

### A. Listing 12.08/12.09

The court finds that analysis under Listing 12.08 or Listing 12.09 produces the same result in this case. Noting "significant evidence of the presence of substance addiction disorder," the ALJ turned to analysis under Listing 12.09 [Substance Addiction Disorders], which referred the ALJ to Listing 12.08 [Personality Disorder]. (*Id.*). Thus, the ALJ properly used Listing 12.08 despite his reference to 12.09. (*Id.*).

This court also finds substantial evidence supporting the ALJ's conclusion that Plaintiff is not disabled under Listing 12.08. To be considered disabled under Listing 12.08, Plaintiff needs to show that her condition meets the requirement of any single sub-listing of Listing 12.08(A) and at least two of the sub-listings of 12.08(B).[8] Even if Plaintiff's condition met or equaled the sub-listings under 12.08(A), the court finds substantial evidence in the record

---

[8]20 C.F.R. Pt. 404, Subpt. P, App. 1. 12.08(B) requires "[D]eeply ingrained, maladaptive patterns of behavior and [r]esulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration."

supporting the ALJ's conclusion that Plaintiff's condition does not meet any two of the sub-listings under Listing 12.08(B). According to the Psychiatric Technique Form completed by Dr. Maclean, Plaintiff had a mild limitation in activities of daily living, and a moderate limitation in social functioning and maintaining concentration, persistence and pace. (Tr. 231). The form also noted that Plaintiff exhibited no episodes of decompensation. (*Id.*). Not one treating or reviewing physician indicated Plaintiff had marked restrictions, as required by the Listing. Even Dr. Hoffman's report, heavily cited by Plaintiff, found that Plaintiff had intact long and short term memory; Plaintiff was able to concentrate and think abstractly; Plaintiff displayed "ok" judgment. (Tr. 263). Dr. Hoffman stated that Plaintiff did not appear mentally ill. (Tr. 262).

### B. Expert Testimony

As to the second issue Plaintiff raised, this court finds that the ALJ was not obligated to have a medical expert testify. While Plaintiff argues a medical expert was needed to properly access her seizure/mental disorders, the court is unpersuaded that the ALJ made his decision based upon inadequate evidence in the record.

To begin with, Plaintiff may have waived this issue. After Plaintiff's hearing, the ALJ sent a proffer letter to Plaintiff's attorney informing him that the missing report from Dr. Hoffman had been received. (Tr. 164). The proffer letter informed Plaintiff that she could submit written comments on the report, submit interrogatories to Dr. Hoffman, request a supplemental hearing, and request that Dr. Hoffman be subpoenaed to appear at a hearing. (Tr. 164). In the proffer letter, the ALJ notified Plaintiff that absent a response, it would be assumed that Plaintiff did not wish to submit written statements or other evidence, or request a supplemental hearing, and the ALJ would "enter the enclosed evidence in the record and issue

20

[his] decision." (Tr. 165). Plaintiff's attorney responded to the proffer letter without a request for a supplemental hearing or interrogatories. (Tr. 77). Plaintiff's response simply stated that Dr. Hoffman's report showed that Plaintiff's substance addiction was in remission, and that Plaintiff met the criteria under Listing 12.08. (Tr. 77).

Plaintiff may wave her right to rebut or cross-examine a witness "if the waiver is clearly expressed or strongly implied from the circumstances." *See Lonzollo v. Weinberger*, 534 F.2d 712, 714 (7th Cir. 1976). In this case, although Plaintiff did not clearly express a waiver, the response letter to the ALJ's proffer likely implied a waiver. The ALJ's proffer letter clearly indicated that if Plaintiff did not ask for supplemental hearing, the ALJ would enclose evidence in the record and issue his decision. Plaintiff was also notified that she could subpoena Dr. Hoffman. Because Plaintiff, through her counsel, responded to the proffer letter, we can assume that Plaintiff read and understood the ALJ's proffer letter. Because Plaintiff did not ask for supplemental hearing or subpoena for any witness, the court is not inclined to re-open Plaintiff's hearing at this time.

Second, even if Plaintiff did not waive her right for calling a medical expert or asking for a supplemental hearing, the ALJ was not obligated to call an expert in this case. In general, an ALJ is required to consult a medical expert if there is not an adequate basis in the record to determine whether the Plaintiff is disabled. *See Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *see also* 20 C.F.R. § 416.927(c)(3) (stating that "[i]f the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, . . . we will . . . ask you or others more information"). The ALJ may not substitute his/her own judgment for a physician's opinion or play doctor. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff's argument for the need of a supplemental expert appears to hinge on Dr. Hoffman's statement that "[h]er 'seizure' history is, if it exists, very atypical. It will be interesting to see what her current EEG and C-Scan shows. This may be a conversion like symptom and pseudo neurological." Somehow, Plaintiff wants the court to conclude from this statement that Plaintiff's pseudo neurological symptoms were disabling, or at least that her medical diagnosis was unclear. However, Dr. Hoffman's statement was more speculation about the origin or existence of Plaintiff's seizures than an opinion of disability or description of symptoms. In this case, the court finds that the ALJ had legitimate reasons for not giving the weight to Dr. Hoffman's statement that Plaintiff argues exists. Dr. Hoffman's statement must be read in context with the entire record. The doctor's hypothesis about the origin of Plaintiff's seizures, formed after two exams, does not contradict or erase the consistent evidence that Plaintiff's seizures and/or mental disorders do not reach a disabling severity.

Here, there was an adequate basis in the record for the ALJ to conclude that Plaintiff was not disabled without calling an expert. There is nothing unclear in Plaintiff's record, and the record does not otherwise appear to be missing information needed to understand Plaintiff's impairments. Dr. Hoffman's statement expressing an interest in seeing Plaintiff's EEG and C-Scan results is not a concern because those tests were performed the very same day Plaintiff saw Dr. Hoffman, and the results did not indicate any abnormal neurophysiological activities. (Tr. 206, 188).

There is also nothing in Plaintiff's medical records to suggest that Plaintiff's symptoms are disabling, nor is their evidence indicating the presence of marked restrictions. Dr. MacLean's MRFC indicated no marked restrictions, and even Dr. Hoffman's report lends

22

support to a finding of no marked restrictions. Regarding activities of daily living, Dr. Hoffman noted that Plaintiff was able to make appointments, go to parenting classes, visit her children, clean her house, and go to AA and NA meetings daily. (Tr. 263). Regarding maintaining social function, Dr. Hoffman stated that Plaintiff sometimes went to church, went to parenting school, and had a social life supported by NA and AA. (Tr. 263). Regarding Plaintiff's ability to maintain concentration, persistence, or pace, Dr. Hoffman noted that Plaintiff's memory was intact, and her other work-related mental functions, such as judgment, concentration, and abstract thinking were "ok." (*Id.*). No doctor expressed contrary medical opinions. Thus, it was reasonable for the ALJ to conclude no marked restrictions exist based on the record.

According to Plaintiff, her seizures usually last only for a few seconds, and they usually occur when she is at home relaxing. (Tr. 263, 280). There are no records of medical visits due to Plaintiff's seizures. In fact, the clinic progress report dated August 31, 2001, noted that Plaintiff "[had] no real complaints other than her feet hurt." (Tr. 190). While clinic progress reports indicated that Plaintiff was taking Neurontin for seizures, none of the reports contained records of Plaintiff complaining about the seizures. (*Id.*).

Besides the medical records noted above, the only documents referring to Plaintiff's seizures are the two seizure forms filled out by Plaintiff's husband and daughter. These forms were filled out in February, 2003. (Tr. 143-44). Both forms indicated that Plaintiff received advance warning before her seizures occurred. (*Id.*). They also revealed that during the seizures, Plaintiff was conscious, did not bite her tongue, did not lose bladder or bowel control, and was not injured. (*Id.*). Both Plaintiff's daughter and husband did state that Plaintiff appeared tired and confused after the seizures. (*Id.*). However, Plaintiff retained the ability to

23

maintain daily activities like going to AA and NA meetings two or three times every day, going to parenting classes, cleaning her house, and caring for her baby. (Tr. 143, 144, 263).

Finally, numerous pieces of evidence cited by the ALJ detracted from Plaintiff's credibility regarding the severity of her symptoms. Plaintiff testified that her legs bothered her the most of all her health problems, not seizures. (Tr. 279). Plaintiff testified that the reason she left her last job was office politics, not seizures. (Tr. 276). Plaintiff revealed that the reason she did not get another job was that she "got depressed and just gave up," again failing to mention seizures. (*Id.*). Finally, despite Plaintiff's testimony that she was diagnosed with a seizure disorder when she was a month old, Plaintiff managed to work at several jobs. (Tr. 280).

Thus, it was reasonable for the ALJ to conclude, from the lack of evidence in the record regarding Plaintiff's seizures and mental disorders, that Plaintiff's symptoms were not disabling, rather than concluding that further expert testimony was needed. There is no evidence of marked restrictions due to a mental disorder. Substantial evidence leads credence to the ALJ's finding that Plaintiff's seizures did not create major obstacles in Plaintiff's life. Plaintiff's attempt to exaggerate the import of Dr. Hoffman's statement does not stand up against the longitudinal record. Accordingly, the court finds that there was substantial evidence to support the ALJ's conclusion that Plaintiff is not disabled under the Listings. The court affirms the ALJ's Step Three decision.

**D.     Step Four: Is the claimant capable of performing work which the claimant performed in the past?**

In performing the analysis for Step Four, the ALJ determined that Plaintiff was not capable of performing her past relevant work. (Tr. 22 ). Before doing so, the ALJ determined Plaintiff's residual functional capacity (RFC). (Tr. 21, 22). The RFC is what a claimant can still do despite his or her limitations. *See* 20 C.F.R. §416.945. After considering the entire record, including Plaintiff's allegations of disabling symptoms and limitations, as well as the combined effect of obesity on Plaintiff's other impairments, the ALJ concluded that Plaintiff's medically determinable impairments preclude the following work-related activities:

> lifting more than 50 pounds occasionally or more than 25 pounds
> frequently; performing work with or near dangerous moving
> machinery, around unprotected heights, or in situations where having a
> brief jerking like seizure or a brief staring spell would be dangerous to
> the [Plaintiff] or anyone else; understanding, remembering and/or
> carrying out detailed instructions; moderately limited ability to interact
> appropriately with the public; and, moderately limited ability to accept
> instructions and criticism from supervisors and respond appropriately
> to changes in the work setting.

(Tr. 19).

In support of his RFC statement, the ALJ expressed that Plaintiff's objective medical record failed to provide support for Plaintiff's subjective allegations of disabling symptoms and limitations. (Tr. 19, 20). The ALJ noted that Plaintiff's medical records disclosed a history of conservative treatment for asthma, sinusitis, gastritis, GERD, non-insulin dependent diabetes mellitus, obesity, seizures, and depression. (Tr. 19). The ALJ also noted that Plaintiff's diabetes was controlled by diet only. (*Id.*). The ALJ further noted that Plaintiff received conservative emergency room treatment for her hypoglycemic episode and acute bronchitis. (*Id.*). Additionally, the ALJ noted that although a CT study of Plaintiff's brain indicated findings

suggestive of a chronic left parietal infarct, her later MRI study, EEG study, and ultrasound study did not suggest any abnormal activities. (*Id.*).

The ALJ also used Dr. Hoffman's psychiatric examination reports to support his RFC. First, the ALJ noted that the report completed in August, 2001 indicated that although Plaintiff was in an angry mood, she did not appear physically or mentally ill. (Tr. 20). Second, the ALJ noted that Plaintiff's concentration, judgment, abstract thinking, fund of knowledge, and memory were intact according to Dr. Hoffman. (*Id.*). Third, the ALJ noted that the Dr. Hoffman's 2003 report indicated Plaintiff was observed to think, reason, and respond in logical, coherent and prompt manners. (*Id.*). Fourth, the ALJ noted that, according to Dr. Hoffman, there was no evidence of asthma, dissociation, or seizures during the examination, and the Plaintiff's alleged PTSD was minimal and did not meet full criteria. (*Id.*). Finally, the ALJ stated that there was no record containing any opinions from treating or examining physicians indicating that the Plaintiff was disabled, and noted that the RFC provided by the State Disability Determination Services supported his finding that Plaintiff was not disabled. (*Id.*).

The court's own review of the record as a whole revealed no errors of law and a ruling that is supported by substantial evidence. Plaintiff, herself, does not challenge the ALJ's credibility analysis or the physical component of her RFC. While Plaintiff does challenge the ALJ's findings regarding the severity of her mental disorders under Listing 12.08, the court has already addressed the thrust of Plaintiff's argument at Step Three. Just as Plaintiff's medical records do not establish Listing level severity, Plaintiff's medical records do not provide support

for greater limitations than those included in the ALJ's RFC. Moreover, Plaintiff has failed to point to any evidence that convincingly calls into question the ALJ's finding.

Even though rational minds may disagree as to the outcomes flowing from testimony presented, the court will uphold the ALJ's decision if substantial evidence underling it exists. *See Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989). In this case, the court finds that the ALJ built up solid support for his RFC. The ALJ's conclusion that Plaintiff was not capable of performing her past relevant work was supported by substantial evidence. The court affirms the ALJ's Step Four decision.

### E. Step Five: Is Plaintiff capable of performing any work existing in substantial numbers in the national economy?

At Step Five, the ALJ relied on Medical-Vocational Rule 203.29 and the testimony of the VE to determine if Plaintiff could perform substantial gainful work that exists in the national economy. (*See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 3, Rule 203.29). Based on Plaintiff's RFC (allowing for performance of a limited range of medium work) and Plaintiff's status as a younger individual with more than a high school education (*see* 20 C.F.R. 404.1563), the ALJ reached a finding of "not disabled." (Tr. 23).

Specifically, the ALJ found, based on the VE's testimony, that Plaintiff could find work in the regional economy in packaging (44,743 jobs), sorting (24,457 jobs), and assembly (65,494 jobs). Plaintiff does not dispute the ALJ's analysis at Step Five. The ALJ's RFC has already been reviewed and approved of in this court's Step Four Analysis. Substantial evidence exists in the record supporting the ALJ's decision. Therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII. CONCLUSION

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is affirmed.

Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

Defendant's Motion for Judgment is granted.

ENTER:

_____

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

DATE: 8/30/05